**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| _____ : | |
| DAY KIMBALL HEALTHCARE, INC. and : | |
| ERICA J. KESSELMAN, M.D., : | |
| : | |
| Plaintiffs, : | |
| : | Case No. 3:19-cv-01521-KAD |
| v. : | |
| : | |
| ALLIED WORLD SURPLUS LINES : | |
| INSURANCE COMPANY F/K/A DARWIN : | |
| SELECT INSURANCE COMPANY, ET AL : | November 21, 2019 |
| _____ : | |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS FILED BY**
**ALLIED WORLD SURPLUS LINES INSURANCE COMPANY F/K/A DARWIN**
**SELECT INSURANCE COMPANY**

## I.     Introduction

The Plaintiffs, Day Kimball Healthcare, Inc. ("Day Kimball") and Erica J. Kesselman,

M.D. ("Dr. Kesselman")(collectively "the Plaintiffs"), submit this Memorandum of Law in

opposition to Allied World Surplus Lines Insurance Company's ("Allied World") Motion to

Dismiss dated October 17, 2019, Doc. No. 19 ("Motion").  In moving to dismiss the Plaintiffs

Complaint dated August 30, 2019 ("Complaint")(Doc. No. 1 at pp. 22-38), Allied World focuses

exclusively on the Umbrella Claims Made Professional Liability Insuring Agreement ("Insuring

Agreement A") in the Health Care Organization Umbrella Liability Insurance Policy that Darwin

Select Insurance Company ("Darwin") issued to Day Kimball.[1]  Allied World ignores the fact

ORAL ARGUMENT REQUESTED

_____

[1] Darwin issued the Umbrella Liability Insurance Policy to Day Kimball with effective dates of October 1, 2012 to
October 1, 2013.  Darwin subsequently became known as Allied World. All references to Darwin or Allied World in
this Memorandum are to the same entity.

that its policy includes an Excess Follow Form Liability Insuring Agreement ("Insuring Agreement C"), which provides liability coverage in excess of the underlying primary insurance available to the Plaintiffs under Lexington Insurance Company Policy No. 6796761 ("Lexington Policy").  Contrary to the argument in the Motion and the supporting memorandum of law, Allied World has not established that the Plaintiffs are not entitled to coverage under the Darwin Policy under any set of facts consistent with the allegations of the Plaintiffs' Complaint. Accordingly, the Motion should be denied.

## II.    Factual Background

Plaintiffs filed this declaratory judgment action in the Connecticut Superior Court, seeking excess liability coverage under two insurance policies for negligence claims alleged against them in an underlying medical negligence case entitled *Meagan Corona, Individually and Estella Tabor PPA Meagan Corona v. Day Kimball Healthcare, Inc., et al.*, pending in the Connecticut Superior Court for the Judicial District of Hartford ("Underlying Lawsuit"). Complaint ("Compl."), ¶1.  The Defendants removed the declaratory judgment action to this Court on September 26, 2019.  Doc. No. 1.  Each Defendant then filed a Motion to Dismiss the Plaintiffs' Complaint on October 17, 2019.  Doc. Nos. 18 and 19.

Day Kimball is a healthcare organization that operates Day Kimball Hospital, a community hospital that serves Northeastern Connecticut and parts of Massachusetts and Rhode Island.  Compl. ¶9, Doc. No. 1 at pp. 22-38.  Dr. Kesselman is an obstetrician gynecologist who was an employee of Day Kimball and a member of Day Kimball Hospital's medical staff at all relevant times. *Id*., ¶10.  On August 7, 2013, Meagan Corona gave birth to Estella Tabor at Day Kimball Hospital.   Dr. Kesselman performed the delivery.  *Id.*, ¶15.  After the delivery, Estella Tabor was transported to UMass Medical Center for treatment in the neonatal intensive care unit.

Compl. ¶16, Doc. No. 1 at pp. 22-38.  On November 3, 2015, Megan Corona, on behalf of herself and as parent of Estella Tabor commenced the Underlying Lawsuit, alleging claims of medical negligence against Day Kimball and Dr. Kesselman and seeking damages for injuries they each allege they sustained due to the alleged medical negligence.  *Id.,*  ¶¶17-18.  Day Kimball and Dr. Kesselman deny the allegations of medical negligence in the Underlying Lawsuit.  *Id.*, ¶21.

At the time of the alleged negligent medical incident in the Underlying Lawsuit, the Plaintiffs were insured under a primary liability insurance policy issued by Lexington Insurance Company, Policy No. 6796761 ("Lexington Policy").  Day Kimball provided Lexington with notice of the issues relating to the birth of Estella Tabor and the Underlying Lawsuit, and Lexington agreed to defend and is defending Day Kimball and Dr. Kesselman in the Underlying Lawsuit.  *Id.*, ¶¶22-23.

Darwin issued a Health Care Organization Umbrella Liability Insurance Policy, Policy No. 0305-9808 to Day Kimball with effective dates of October 1, 2012 to October 1, 2013 with limits of liability of $10 million per incident and in the aggregate (the "Darwin Policy").  *Id.*, ¶28, Ex. B, Doc. No. 1 at pp. 61-103.  The Darwin Policy provides both Umbrella Claims Made Professional Liability coverage and Excess Follow Form Liability coverage excess to the liability coverage under the Lexington Policy.  Compl., ¶¶29, 30, Doc. No. 1 at pp. 22-38.  Day Kimball notified Allied World of the Underlying Lawsuit on March 24, 2017 and sought excess liability coverage for the claims in the Underlying Lawsuit under the Darwin Policy.  *Id.*, ¶24.  Allied World, however, denied coverage under the policy on the grounds that the claim alleging medical negligence against the Plaintiffs was asserted on November 3, 2015 when the Underlying Lawsuit was filed, after the Darwin Policy had expired and that the Underlying

Lawsuit was not reported until March 24, 2017.  Allied World also denied that Dr. Kesselman

was an insured under the Darwin Policy.[2]  Compl., ¶¶25-26, Doc. No. 1 at pp. 22-38.

### III.    Legal Argument

#### A.  Federal Rule 12(b)(6)

Under the Federal Rules, a plaintiff is only required to plead "a short and plain statement

of the claim showing that the pleader is entitled to relief, in order to give the defendant fair

notice of what the … claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, 555 (2007) *citing Conley v. Gibson,* 355 U.S. 41, 47 (1957).  A

complaint must contain enough factual content which, accepted as true, states a claim that is

plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id* at 678. This plausibility

standard is not a "probability requirement."  *Id.*  A plaintiff does not need to plead facts with

exquisite detail, but must provide enough facts to raise a reasonable expectation that discovery

will reveal evidence to support the claims alleged.  *Van Dorsten v. Provident Life and Accident*

*Ins. Co.,* 554 F.Supp.2d 285, 289 (D. Conn. 2008).

#### B.  Connecticut Law Governs the Interpretation of the Policy

As the Connecticut Supreme Court has reiterated on numerous occasions:

> The interpretation of an insurance policy, like the interpretation of other written
> contracts, involves a determination of the intent of the parties as expressed by the
> language of the policy . . . The determinative question is the intent of the parties,
> that is, what coverage the . . . insured expected to receive and what the insurer
> was to provide, as disclosed by the provisions of the policy . . . It is axiomatic that

---

[2] Although Allied World denied that Dr. Kesselman was an insured under the Darwin Policy in March 2017, Allied World did not raise that issue in the Motion, reserving its right to challenge whether she is an insured under the Policy.  Memorandum of Law in Support of Motion to Dismiss, Doc. No. 19-1, p. 4 n.1  The issue is therefore not relevant to a disposition of the Motion.

a contract of insurance must be viewed in its entirety, and the intent of the parties
for entering it derived from the four corners of the policy . . ..

*Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co. of Illinois*, 247 Conn. 801, 805, (1999).  *See
also R.C. Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 246 (2d Cir. 2002).  If the terms
of an insurance policy are clear and unambiguous, the intent of the parties is to be deduced from
the natural and ordinary meaning of the language in the insurance policy.  *Arrowood Indem. Co.
v. King*, 304 Conn. 179, 186-87 (2012), quoting *Johnson v. Connecticut Ins. Guaranty Assn*., 320
Conn. 639, 643 (2011).  When interpreting an insurance policy, a court "must look at the contract
as a whole, consider all relevant portions together and, if possible, give operative effect to every
provision in order to reach a reasonable overall result."  *Id.* at 187.  No word or clause of an
insurance policy should be "eliminated as meaningless, or disregarded as operative, if any
reasonable meaning consistent with the other parts of the policy can be given to it."  *A.M. Larson
Co. v. Lawlor Ins. Agency*, 153 Conn. 618, 622 (1966), citing *Downs v. National Casualty Co.*,
146 Conn. 490, 495 (1959).   "[A] court will not torture words to import ambiguity where the
ordinary meaning leaves no room for ambiguity . . . Similarly, any ambiguity in a contract must
emanate from the language used in the contract rather than from one party's subjective
perception of the terms . . .."  *Arrowood*, 304 Conn. at 187, quoting *Johnson*, 320 Conn. at 643.
A provision in an insurance policy is ambiguous when it is reasonably susceptible to more than
one reading.  *Id.*  "[A]ny ambiguity in the terms of an insurance policy must be construed in
favor of the insured because the insurance company drafted the policy."  *Id.*

### C.    The Darwin Policy Is Not a Claims-Made and Reported Policy

In its Motion, Allied World contends that the Darwin Policy is a "claims-made and
reported policy" and submits that the sole question for the Court to consider is whether "the
Complaint plausibly states a claim for coverage under a claims-made and reported insurance

policy." Defendant's Memorandum of Law in Support of Motion to Dismiss, Doc. No. 19-1

("Memorandum"), pp. 1, 2-3, 9, 12-13, 16. Allied World's argument, however, ignores the plain

language of its policy, which indicates that it is not solely a claims-made policy. The

Declarations Page of the Darwin Policy provides:

> **THIS POLICY MAY CONTAIN BOTH *CLAIMS MADE AND OCCURRENCE COVERAGE PARTS*. UNLESS OTHERWISE SPECIFIED, THE COVERAGE PROVIDED BY THIS POLICY SHALL ONLY APPLY IN EXCESS OF SCHEDULED UNDERLYING INSURANCE OR SELF-INSURANCE. THE APPLICABLE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES, SETTLEMENTS OR JUDGMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

Policy (attached as Exhibit B to Complaint), p. 1 (Doc. No. 1, p. 61). *See also* Policy, III.

EXCLUSIONS, ¶¶A-C (Doc. No. 1, p. 85)(referring to both claims-made and

occurrence-based insuring agreements); Policy, IV. CONDITIONS, ¶M EXTENDED

REPORTING PERIOD (Doc. No. 1, p. 99-100) (explaining that the extended reporting

period applies only to "any Claims Made Insuring Agreement of this Policy").

The Darwin Policy contains three insuring agreements that set forth Darwin's

agreements to indemnify its insured under the policy, which include both claim-made and

occurrence-based insurance coverage. Policy, I. INSURING AGREEMENTS ¶¶A-C

(Doc. No. 1 at pp. 76-77). Insuring Agreement C, entitled Excess Follow Form Liability,

outlines Darwin's agreement to indemnify the insured in excess of certain underlying

primary insurance policies. *Id*., INSURING AGREEMENT ¶C EXCESS FOLLOW

FORM LIABILITY (Doc. No. 1 at p. 77). Unlike Insuring Agreement A, an Umbrella

Claims Made Professional Liability insuring agreement on which Allied relies for its

Motion, the Excess Follow Form Liability coverage provided under Insuring Agreement

C is not a claims-made and reported coverage provision. It contains no language that

requires that a claim be made and reported in order for coverage under the insuring agreement to be triggered.  *Compare* Insuring Agreement A with Insuring Agreement C.[3] Allied World is simply mistaken when it argues that the Darwin Policy is a claims-made and reported policy.

**D.    Insuring Agreement C Provides Excess Liability Insurance Coverage That Follows Day Kimball's Primary Lexington Policy**

Allied World completely ignores the language within Insuring Agreement C of its policy when it argues that the Complaint should be dismissed because the Plaintiffs did not Comply with a claimed condition precedent in Insuring Agreement A.  Insuring Agreement C, an "EXCESS FOLLOW FORM LIABILITY" coverage part, provides:

> The **Insurer** will pay on behalf of the **Insured,** subject to the Limit of Liability set forth in the Declarations, **Loss** and **Defense Expenses** *in excess of the* ***Applicable Underlying Limit*** *for the insurance* identified in Items 3 and 4 of the Schedule of Underlying Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** covered by such Scheduled Underlying Insurance. The terms and conditions of such Scheduled Underlying Insurance are, with respect to this Insuring Agreement C, made a part of this Policy, except with respect to:
>
> 1.    any contrary provision contained in this Policy; or
>
> 2.    any provision in this Policy for which a similar provision is not contained in the Scheduled Underlying Insurance,
>
> in which case the provisions of this Policy will apply.  In no event will the coverage provided under this Policy be broader than the coverage provided under the Scheduled Underlying Insurance.
>
> Notwithstanding anything to the contrary contained above, if the Scheduled Underlying Insurance does not provide coverage, for reasons other than

---

[3] There are two insuring agreements that arguably can be considered claims-made insuring agreements because they require that a claim of liability be made against the insured "during the Policy Period or any applicable Extended Reporting Period."  Policy, I. INSURING AGREEMENT A. UMBRELLA CLAIMS MADE PROFESSIONAL LIABILITY and INSURING AGREEMENT B2. Claims Made General Liability (Doc. No. 1 at pp. 76-77). Condition M of the Policy, which governs potential coverage under any Extended Reporting Period, applies to "any Claims Made Insuring Agreement of this Policy" and is further evidence that there are coverage agreements in the Darwin Policy other than claims-made coverage.  *Id.* at IV, CONDITIONS ¶M (Doc. No. 1 at pp. 99-100).

exhaustion of the **Applicable Underlying Limit** due to the payment of **Claims,** then this Insuring Agreement C. similarly will not provide coverage.

This Insuring Agreement is only applicable if so indicated in Item 8 of the Declarations.

Policy, I. INSURING AGREEMENTS ¶C EXCESS FOLLOW FORM LIABILITY

(Doc. No. 1, p. 77) (emphasis added)(bold in original).  Item 8 of the Declarations of the

Darwin Policy states that Insuring Agreement C is included within the coverages

provided under the policy. Policy, HEALTH CARE ORGANIZATION UMBRELLA

POLICY DECLARATIONS, Item 8 (Doc. No. 1 at pp. 61-62).

### E.   Under Insuring Agreement C, Allied World Must Pay Defense Expenses and Any Settlement or Judgment in Excess of the Limits of the Underlying Lexington Policy

Under the terms of Insuring Agreement C, Darwin agreed to pay on behalf of "the

Insured", "**Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit**

for the insurance identified in Items 3 and 4 of the Schedule of Underlying Insurance . .

.."  Policy, I. INSURING AGREEMENTS ¶C (Doc. No. 1, p. 77) (emphasis added)(bold

in original).  To understand the full scope of coverage provided under Insuring

Agreement C, one must look at all provisions of the Darwin Policy, including the

Schedule of Underlying Insurance and the Definitions section, in addition to the language

within Insuring Agreement C.  The term "**Loss**" is defined in the policy as "any monetary

amount paid on account of an award, judgment, or settlement which the Insured is legally

obligated to pay as a result of a **Claim**."  Policy, II. Definitions, ¶R (Doc. No. 1 at p. 81).

The term "**Defense Expenses**" includes the "reasonable fees, costs and expenses incurred

by or on behalf of the **Insured** in connection with the defense of a **Claim** . . .."  *Id.*, ¶G

(Doc. No. 1 at p. 78).  Under the terms of Insuring Agreement C, therefore, Allied World

is obligated to pay all reasonable fees and costs in connection with the defense of a

"Claim" and any monetary judgment or settlement against its insured "in excess of the **Applicable Underlying Limit** for the insurance identified in the Schedule of Underlying Insurance." *See* Policy, I. INSURING AGREEMENTS ¶C (Doc. No. 1, p. 77)   The Darwin Policy defines the term "**Applicable Underlying Limit**" to mean: "The greater of (1) the total of all available limits of liability *for the applicable* **Underlying Insurance** plus any **Other Insurance**, less the amount by which any aggregate limit thereunder has been reduced by the payment of covered losses, or (2) the **Retained Amount**." *Id.* at II. DEFINITIONS, ¶B (Doc. No. 1, p. 78)(emphasis added)(bold in original).  Darwin included the defined term "**Underlying Insurance**" within the definition of "**Applicable Underlying Limit**", and defined the term "**Underlying Insurance**" to mean "*the insurance policies identified in the Schedule of Underlying Insurance* and any Self Insured Retention identified in the Schedule of Underlying Self Insurance." *Id*. at ¶II (Doc. No. 1, p. 84) (emphasis added)(bold in original).  The Policy's Schedule of Underlying Insurance identifies three insurance policies which are beneath the Darwin Policy: (1) Lexington Insurance Company Policy No. 6796761 with effective dates of October 1, 2012 to October 1, 2013; (2) Zurich American Insurance Co. Policy No. BAP3036733-07 with effective dates of October 1, 2012 to October 1, 2013; and, (3) MEMIC Indemnity Co. Policy No. 310 2801657 with effective dates of October 1, 2012 to October 1, 2013.  Policy, HEALTHCARE ORGANIZATION UMBRELLA LIABILITY INSURANCE POLICY SCHEDULE OF UNDERLYING INSURANCE at p. 1 (Doc. No. 1 at p. 74-75)("Schedule of Underlying Insurance").

Under the definition of "Applicable Underlying Insurance" as that term is used in Insuring Agreement C, Darwin agreed to pay loss and defense expenses in excess of the

applicable limits of the three underlying insurance policies identified in the Schedule of Underlying Insurance, which includes the primary Lexington Policy under which Day Kimball and Dr. Kesselman are being defended in the Underlying Lawsuit.  *See* Compl., ¶¶22-23 (Doc No. 1 at pp. 24-38).  Insuring Agreement C expressly states that Darwin will pay "in excess of the ***Applicable Underlying Limit*** *for the insurance* identified in Items 3 and 4 of the Schedule of Underlying Insurance"(emphasis added)  "The insurance" identified in Items 3 and 4 of the Schedule of Underlying Insurance, and included within the term of "Underlying Insurance" in the policy's definition of "Applicable Underlying Limit", includes the Lexington Policy and a Zurich American Insurance Co. Policy.  *See* Schedule of Underlying Insurance, INSURER, POLICY NUMBER, POLICY PERIOD (Doc. No. 1 at p. 74).

The Excess Follow Form Liability coverage provided under Insuring Agreement C of the Darwin Policy is distinct and broader than the Umbrella Claims Made Professional Liability and Umbrella General Liability coverages provided under Insuring Agreements A and B of the Darwin Policy.  Insuring Agreements A and B provide coverage "in excess of the Applicable Underlying Limit *for the coverage*" identified Items 1 and 2 of the Schedule of Underlying Insurance, which identifies the type of coverage to which those insuring agreements apply.  *See* Schedule of Underlying Insurance, TYPE OF COVERAGE (Doc. No. 1 at p. 74).  Darwin, however, used different language in Insuring Agreement C when it agreed to provide Excess Follow Form Liability coverage under that section "in excess of the Applicable Underlying Limit *for the insurance*" identified in Items 3 and 4.  The use of the term "for the insurance" in Insuring Agreement C rather than the term "for the coverage" as used in Insuring

Agreements A and B, coupled with the inclusion of the underlying insurance policies identified in the Schedule of Underlying Insurance within the definition of "Applicable Underlying Limit", demonstrates an intent under Insuring Agreement C to provide excess liability coverage to the underlying policies irrespective of when the claim against the Plaintiffs was filed[4].  Allied World completely ignores the coverage provided under Insuring Agreement C notwithstanding it is alleged in the Plaintiffs' Complaint.  Compl. at ¶¶28-33 (Doc. No. 1 at pp. 28-29).

> **F.**     **Coverage Under The Excess Follow Form Liability Coverage in Insuring Agreement C is Triggered Because Lexington is Defending Day Kimball and Dr. Kesselman in the Underlying Lawsuit**

Under the express language of Insuring Agreement C, Darwin agreed to indemnify the insured for loss and defense expenses in excess of the Applicable Underlying Limit of the Underlying Insurance "which the **Insured** becomes legally obligated to pay *as a result of a **Claim** covered by such Scheduled Underlying Insurance*."  Policy, I. INSURING AGREEMENT C. (Doc. No. 1 at p. 77)(emphasis added)(bold in original).  Unlike the coverage provided under Insuring Agreement A, the coverage provided under Insuring Agreement C is not dependent on a claim having been asserted against the insured during the effective dates of the policy or any applicable extended reporting period.  Rather, it is dependent on the claim being covered by the underlying insurance policy.

Insuring Agreement C is similar to an occurrence-based policy and, under the express terms of the agreement, provides excess liability coverage so long as the claim

---

[4] To the extent that the use of the different words in insuring agreements A and C render the language ambiguous any ambiguity must be construed in favor of the Plaintiffs.  *Arrowood*, 304 Conn. at 187.

against the insured is covered by an underlying insurance policy identified in the

Schedule of Underlying Insurance.  If coverage under Insuring Agreement C was

dependent on a claim being asserted against the insured during the policy period, there

would be no need for Insuring Agreement C because the coverages provided under

Insuring Agreements A and B would be sufficient to limit coverage under the policy to

claims made against the insured within the effective dates of the policy.  The excess

liability coverage Darwin agreed to provide under Insuring Agreement C is separate and

distinct from the coverage provided under the Insuring Agreements A and B, as reflected

by Item 8 of the Declarations.  It appears clear that the parties intended Insuring

Agreement C to provide excess liability coverage that follows the Lexington Policy.

Such a conclusion is supported by the language of Insuring Agreement C, which is

entitled "Excess Follow Form Liability" and states that the terms and conditions of the

Lexington Policy are expressly incorporated into the insuring agreement in order to

provide coverage consistent with the underlying insurance but no broader coverage.  *See*

Policy, I. INSURING AGREEMENT C (Doc. No. 1 at p. 77) ("[t]he terms and

conditions of such Scheduled Underlying Insurance are, with respect to Insuring

Agreement C, made a part of this Policy" and "[i]n no event will the coverage provided

under this Policy be broader than the coverage provided under the Scheduled Underlying

Insurance").

Plaintiffs allege in the Complaint that Day Kimball notified Lexington Insurance

Company of the medical incident under Policy No. 6796761 on August 8, 2013 and that

Lexington is defending Day Kimball and Dr. Kesselman in the Underlying Lawsuit.

Compl., ¶¶22-23 (Doc. No. 1 at p. 27).  Under the express language of Insuring

Agreement C of Policy, therefore, the Plaintiffs are entitled to indemnification from Allied World for any "Loss" or "Defense Expenses" in excess of the limits of the underlying Lexington Policy.  Allied World's Motion should be denied.

### G.   Allied World Has Not Established it was Materially Prejudiced as a Result of Any Claimed Late Notice

Allied World only argues that it is not obligated to provide Umbrella Claims Made Professional Liability Coverage under Insuring Agreement A because the claim arising from the alleged medical incident which is the subject of the Underlying Lawsuit was not made during the policy period or any extended reporting period.  Memorandum of Law at pp. 4-5, 10-12.  Allied World also contends that it was not provided with notice of the Underlying Lawsuit during the policy period and, therefore, the Underlying Lawsuit cannot relate back to any earlier notice of a medical incident provided during the policy period.  *Id.* at pp. 12-17, citing Policy, Section IV, CONDITIONS ¶F. As explained previously, Allied World's argument ignores the fact that the Excess Follow Form Liability Coverage provided under Insuring Agreement C is not a claims-made and reported insuring agreement. If Allied World were to subsequently argue that coverage is barred under Insuring Agreement C because the Plaintiffs did not provide it with timely notice in accordance with the Conditions Section of the Policy, the Motion should still fail because Allied World has not, and cannot, establish that it was materially prejudiced by any failure to comply with a notice condition of the Darwin Policy.  Connecticut law is clear that if an insurer wishes to avoid its obligations under an insurance policy based on an insured's failure to comply with a condition governing notice, the insurer must establish that it was materially prejudiced as a result of the failure to comply with the condition.  *Arrowood Indem. Co. v. King*, 304 Conn. 179, 201-203 (2012).

The Reporting/Notice Condition of the policy required the insured to provide Allied World with "prompt notice "of a claim under any Underlying Insurance, or certain incidents that could give rise to a claim under any Underlying Insurance", including certain birth-related injuries.  Policy, Section IV, CONDITIONS ¶D Reporting/Notice, ¶1 (Doc. No. 1 at pp. 94-96).  "Prompt notice" is generally construed to mean reasonably timely notice under the circumstances of a particular case.  *Arrowood,* 304 Conn. at 199 n. 14; *Baker v. Metropolitan Casualty Ins. Co.*, 118 Conn. 147, 149 (1934).

"Connecticut law requires two conditions be satisfied before an insurer's duties can be discharged pursuant to the 'notice' provision of a policy: (1) an unexcused, unreasonable delay in notification by the insurer; and (2) resulting material prejudice to the insurer."  *Arrowood*, 304 at 198, quoting *Arrowood Indem. Co. v. King*, 605 F.2d 62, 65 (2d. Cir. 2010).  As the Connecticut Supreme Court has stated:

> The purpose of a policy provision requiring the insured to give the [insurance] company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances. And further, if the insurer is thus given the opportunity for a timely investigation, reasonable compromises and settlements may be made, thereby avoiding prolonged and unnecessary litigation.  If this legitimate purpose can be protected by something short of automatic enforcement of the notice provisions, then their strict enforcement is unwarranted . . . A proper balance between the interests of the insurer and the insured requires a factual inquiry into whether, in the circumstances of a particular case, an insurer has been prejudiced by its insured's delay in giving notice of an event triggering insurance coverage. If . . . the insurer suffered no material prejudice from the delay, the nonoccurrence of the condition of timely notice may be excused because it is not . . . a material part of the agreed exchange.

*Reichhold Chemicals, Inc. v. Hartford Acc. and Indem. Co.*, 243 Conn. 401, 418 (1997), quoting *Aetna Casualty & Surety Co. v. Murphy*, 206 Conn. 409, 417 (1988), *overruled in part by Arrowood*, 304 Conn. 179.  In *Murphy*, the Connecticut Supreme Court ruled

that the rigor of the traditional principle of strict compliance with a condition required in an agreement between two parties "has increasingly been tempered by the recognition that the occurrence of a condition may, in appropriate circumstances, be excused in order to avoid a 'disproportionate forfeiture.'" *Murphy*, 206 Conn. at 413. Accordingly, "in the absence of conduct that is 'wilful,' a contracting party may, despite his own departure from the specifications of his contract, enforce the obligations of the other party with whom he has dealt in good faith." *Id.* This is especially true in the context of insurance policies, which are contracts of adhesion under which the insured has no occasion to bargain about the consequences of delayed notice. *Id.* at 415. The question of what circumstances warrant relief from the rigorous enforcement of contract provisions that would amount to a forfeiture "is one of degree, to be answered, if there is doubt, by the triers of the facts." *Id*. at 414-415, quoting *Jacobs v. Youngs, Inc. v. Kent*, 230 N.Y. 239, 242-43, 129 N.E. 889 (1921).

Allied World has not established in the Motion that there was an unexcused failure on the part of its insured to comply with a notice condition of the policy. Even if Allied World were successful with such an argument, it would not be relieved of its obligation to provide coverage. Allied World still must prove that it was materially prejudiced in order to avoid its contractual obligations. *Arrowood v. King*, 304 Conn. at 203. It has not done so.

Allied World has not established in the Motion that it suffered any prejudice, let alone material prejudice. It is unlikely that it can establish any such prejudice under the circumstance of this case. As explained previously, the Policy is an "Umbrella Liability Insurance Policy" which requires that the limits of the underlying Lexington Policy be

exhausted by payment of defense expenses or a settlement or judgment before Allied

World must indemnify Day Kimball.  *See* Policy, I. INSURING AGREEMENT C.; IV.

CONDITIONS ¶B Defense and Settlement of Claims; IV. CONDITIONS ¶J Payment of

Loss (Doc. No. 1 at pp. 77, 93-94, 98).  By requiring an insurer to establish material

prejudice in order to be relieved of its obligations under an insurance policy for a claimed

failure to comply with a notice condition, Connecticut courts "balance the competing

principles of protecting an insured from disproportionate forfeiture and safeguarding an

insurer's legitimate interest in protection from stale claims."  *Arrowood*, 304 Conn. at

202.  *See also Murphy*, 206 Conn. at 417 ("The purpose of a policy provision requiring

the insured to give the company prompt notice of an accident or claim is to give the

insurer an opportunity to make a timely and adequate investigation of all the

circumstances . . . And further, if the insurer is thus given the opportunity for a timely

investigation, reasonable compromises and settlements may be made, thereby avoiding

prolonged and unnecessary litigation.").  Three principles should be considered when

determining whether the circumstances of a particular case warrant relief from an

insured's failure to strictly comply with a notice provision in a liability insurance policy.

First, a notice condition is part of an insurance policy, which is recognized as a

contract of adhesion under which the parties do not have the occasion to bargain about

the consequence of delayed notice.  *See Murphy*, 206 Conn. 409, 416.  An insurance

contract is generally "drawn up by the insurer and the insured, who merely 'adheres' to it,

has little choice as to its terms . . . Standardized contracts of insurance continue to be

prime examples of contracts of adhesion, whose most salient feature is that they are not

subject to the normal bargaining processes of ordinary contracts."  *Id*., citing *Nationwide*

*Ins. Co. v. Gode*, 187 Conn. 386, 404 (1982).  There is no evidence submitted with Allied World's Motion that suggests that the notice conditions were brought to the attention of the Plaintiffs before the Policy was issued or, had they been brought to their attention, the conditions would have been subject to negotiation.  The Darwin Policy is a contract of adhesion which weighs against forfeiture for failure to strictly comply with a notice condition.  *Cf. Murphy*, 206 Conn. at 416-417.

Second, the Court should consider whether strict enforcement of the notice conditions will operate as a forfeiture of insurance coverage, which is exactly what Allied World seeks through the Motion. *Id*. at 417.  Literal enforcement of the notice provision requiring "prompt notice" of a claim under the underlying Lexington Policy, or "prompt notice" of a birth-related injury that may give rise to a claim under the underlying Lexington Policy, may discharge Allied from its obligation to indemnify the Plaintiffs under the Umbrella Liability Insurance Policy.  This is true even before any obligation on the part of Allied World to indemnify under Insuring Agreement C arises when the insured has yet to become legally obligated to pay defense expenses, a settlement or a judgment in excess of the limits of the underlying Lexington policy.[5]  "The operative effect of noncompliance with the notice provisions is a forfeiture of the interests of the insured that is, in all likelihood, disproportionate." *Aetna Cas. and Sur. Co. v. Murphy*, 206 Conn. 409, 417 (1988).

---

[5] Although the Plaintiffs may not have yet incurred defense expenses in excess of the limits of the underlying Lexington Policy, or become legally obligated to pay a judgment or settlement in excess of such limits, the plaintiffs in the Underlying Lawsuit filed an Offer of Compromise in the amount of $20 million against Day Kimball and Dr. Kesselman on May 8, 2017.  *See Megan Corona et. al, v. Day Kimball Healthcare,* Inc., et al. Connecticut Superior Court Docket No. HHD-CV15-6075511-S, Docket No. 234.  The Court should take judicial notice of this fact.  *See* Fed. R. Evid. 201.  The issues in this declaratory judgment action are therefore ripe for adjudication because the Plaintiffs are exposed to liability in excess of the Applicable Underlying Limit under the Lexington Policy.

Finally, the Court should balance relieving an insured from disproportionate forfeiture arising from loss of coverage due to strict compliance with a notice condition of an insurance policy against an insurer's interest in protecting itself from stale claims. *Id.* at 417. "If this legitimate purpose can be protected by something short of automatic enforcement of the notice provisions, then their strict enforcement is unwarranted." *Id.* Here, there are no "stale claims" because Allied World is an excess insurer whose liability under Insuring Agreement C arises only after the Lexington Policy limits have been exhausted through the payment of defense expenses, a settlement, or a judgment against the Plaintiffs. This condition has yet to occur. It has not been established, and cannot be said, that Allied World has been materially prejudiced by not being permitted to investigate the claims in the Underlying Lawsuit or limited in its ability to make reasonable compromises and settlements in an effort to avoid prolonged and unnecessary litigation. Allied World has neither an obligation to defend nor an obligation to indemnify until after the applicable liability limits under the primary Lexington Policy have been exhausted through payment. *See* Policy, I. INSURING AGREEMENT C. (Doc. No. 1 at p. 77); IV. CONDITIONS ¶B1 (Doc. No. 1 at p. 93). The underlying Lexington Policy provides primary defense coverage for the Plaintiffs in the Underlying Lawsuit. At present, Allied World has "the right, but not the obligation to associate with the Insured in the defense of any such Claim against an Insured." Policy, IV. CONDITIONS ¶ BI (Doc. No. 1 at p. 93) While Allied World also has the right under the Darwin Policy to investigate an occurrence or medical incident, it is only obligated to "assume the defense and/or settlement of any Claims" when: (1) any "Underlying Insurance" or "Other Insurance" has been exhausted by the payment of claims to which

the Darwin Policy applies; or (2) damages are sought for an occurrence, medical incident or claim covered by the Darwin Policy and for which no "Underlying Insurance" or "Other Insurance" applies.  *Id.* at B2[6].  Because neither of these conditions are alleged in the Complaint as having been met, Allied World was not required to assume the defense or settlement of its insured before it received notice of the Underlying Lawsuit. Moreover, Allied World has had the opportunity to investigate the claims in the Underlying Lawsuit since no later than March 24, 2017, when it acknowledges it was notified of the Underlying Lawsuit.  *See* Memorandum at p. 2.  It appears, however, that Allied World took no action after being notified of the Underlying Lawsuit in March 2017 other than to deny coverage less than three weeks later on April 24, 2017.  Compl. ¶¶24-25.  Any ability of Allied World to investigate claims for the purpose of making reasonable compromises and settlements has not been materially affected by the fact it was notified of the Underlying Lawsuit in March 2017.  *See e.g. Lumbermens Mut. Cos. v. RGIS Inventory Specialists, LLC*, 2009 WL 137055 * 9 (S.D.N.Y. 2009), *aff'd* 628 F.3d 46 (2nd Cir. 2010)(finding that excess insurer's refusal to participate in defense of insured after receiving notice militated against finding of prejudice under Michigan law; "Any prejudice does not become material where the carrier, upon notice, does not act or properly act to protect its interest and/or that of its insured" because the prejudice was not attributable to late notice, but to insurer's failure to act upon receiving notice)(attached as **Exhibit A**).

---

[6] Condition J of the Darwin Policy is further evidence that Allied World has not established, and cannot establish, that it suffered material prejudice as a result of any failure to comply with a notice condition in the Policy.  Under Condition J, Allied World is obligated to pay "Loss" under the Policy only after: (1) the underlying insurers have paid their limits of liability; (2) the underlying insurers and all "insureds" have complied with their obligations to defend and pay defense expenses; and, (3) a judgement is rendered against any insured after trial, or a written settlement is agreed upon by the insured, the claimants, any underlying insurers and Allied World.  Policy, IV. CONDITIONS ¶J Payment of Loss (Doc. No. 1 at p. 98).

Allied World has not established in the Motion that it was materially prejudiced by any notice which did not strictly comply with the terms of the Policy as required under *Arrowood Indem. Co. v. King*, 304 Conn. 179 (2012), and it likely cannot establish any such prejudice.   The interests against disproportionate forfeiture weigh in favor of enforcing Darwin's agreement to provide Excess Follow Form Liability coverage under Insuring Agreement C and requiring Allied World to indemnify the Plaintiffs in accordance with the terms of the insuring agreement and the other provisions of the Darwin Policy. *See Murphy*, 206 Conn. at 413.  The Motion should therefore be denied. *Cf.  Darwin Select Insurance Co. v. Middlesex Health System, Inc.*, 2016 WL 7974294 at *4-5 (Conn.Super. Dec. 16, 2016)(Peck, J.) (denying Darwin's motion for summary judgment under a Health Care Organization Umbrella Liability Insurance Policy based on claimed failure of insured to comply with notice condition when insurer failed to demonstrate no issue of material facts concerning issue of material prejudice) (attached hereto as **Exhibit A**).

### IV.    Conclusion

For the reasons set forth herein, the Defendant Allied World has not established that the Plaintiffs' Complaint fails to allege a plausible claim for relief.  Accordingly, the Plaintiffs respectfully request that the Motion to Dismiss be denied.

**DAY KIMBALL HEALTHCARE, INC.**
**ERICA J. KESSELMAN, M.D.,**
**PLAINTIFFS**

By   /s/ Michael T. McCormack
      Michael T. McCormack (ct13799)
      O'Sullivan McCormack Jensen & Bliss PC
      100 Great Meadow Road, Suite 100
      Wethersfield, CT 06109
      Tel: 860-258-1993
      Fax: 860-258-1991
      Email: mmccormack@omjblaw.com
      Its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


By   /s/ Michael T. McCormack
Michael T. McCormack (ct13799)

## **CERTIFICATE OF SERVICE**

      I hereby certify that on November _____, 2019 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                ____/s/ Michael T. McCormack____
                                Michael T. McCormack (ct13799)

# EXHIBIT A

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 25 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

2009 WL 137055
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

LUMBERMENS MUTUAL
CASUALTY COMPANY, Plaintiff,
v.
RGIS INVENTORY SPECIALISTS, LLC, Camrac
Inc. d/b/a Enterprise Rent–A–Car, and Robert
M. Birardi, Defendants–Counterclaimants.

No. 08 Civ. 1316(HB).
|
Jan. 21, 2009.

West KeySummary

**1**   **Insurance**
    Forwarding Demands and Papers;
    Summons and Pleadings

An inventory specialist company provided timely notice under Michigan law of a negligence suit to the insurance company holding their excess insurance policy so that the insurance company was liable for the judgment against the inventory specialist company. Every professional who investigated the accident, in which a non-party was hit by a van operated by an employee of the inventory specialist, found that any finding of liability against the company was unlikely and that the limits of the claim should have been fully resolved within the limits of the company's primary policy. However, once settlement negotiations were unsuccessful the company notified the insurance company of the accident, claim and suit.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

*1 On April 8, 2003, nonparty Robert Shore ("Shore") was walking down a snowy Connecticut highway when he was hit by a minivan driven by Defendant Robert Birardi ("Birardi") in the course of his employment with Defendant RGIS Inventory Specialists, LLC ("RGIS"). The impact of the collision threw Shore to the side of the road, and he sustained serious injuries. The minivan was owned by Defendant Camrac, doing business as Enterprise Rent–A–Car ("Camrac"). Defendants were covered under a primary insurance policy issued by United States Fidelity & Guaranty ("Primary Insurer"), as well as an excess insurance policy issued by Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") to RGIS, the policyholder.

Shore's brother and conservator, David Shore, filed suit in Connecticut state court against Defendants ("Shore Action"), and on January 30, 2008, a jury returned a verdict for Shore finding Defendants 100% liable. On February 13, 2008, following the conclusion of the damages phase of the trial, the jury returned a verdict of more than $11 million in damages. After the trial court entered judgment for Shore, Defendants filed a notice of appeal to the Connecticut state appellate court on June 6, 2008. That appeal remains pending.

On February 8, 2008, Lumbermens filed an action in this Court seeking a declaratory judgment to the effect that Defendants are not entitled to coverage under Lumbermens' Excess Policy for any of the claims in the Shore Action, on the ground that Defendants failed to give timely notice of the accident, claim or suit to Lumbermens. The parties have filed cross motions for summary judgment. For the reasons set forth below, summary judgment is granted in favor of Defendants.

**I. FACTUAL BACKGROUND**

The following facts are undisputed. [1] On April 8, 2003, the date of the accident, RGIS and Birardi were insured under a Business Automobile Liability Policy issued by RGIS's Primary Insurer ("Primary Policy"). The Primary Policy had insurance limits of $2 million. RGIS and Birardi were also insured under the Excess Commercial Catastrophic Liability Policy ("Excess Policy"), issued by Lumbermens to RGIS as the policyholder. Lumbermen's Excess Policy provides coverage for bodily injury and property damage in excess of the Primary Policy up to $25 million. Camrac was qualified as an additional insurer under both policies.

**Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 26 of 37**

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

Lumbermens Excess Policy required the insureds to notify Lumbermens "as soon as practicable of an 'occurrence' or an offense whenever it *appears likely* it will result in a claim involving this [Excess Policy]." (McGregor Aff. Ex. B at 12 (emphasis added) .) "Occurrence" is defined in pertinent part as "an accident." (*Id.* at 15.) Similarly, the Excess Policy required the insureds to provide written notice to Lumbermens of a 'claim' or 'suit' as soon as practicable whenever it *appears likely* that such claim or 'suit' will involve this [Excess Policy]." (*Id.* at 12 (emphasis added).) While "claim" is not defined, "suit" is defined in pertinent part as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this [excess] insurance applies are alleged." (*Id.* at 16.)

*\*2* Birardi, the driver of the vehicle, notified RGIS, his employer, of the accident at 8:30 a.m. on April 8, 2003, within a few hours after the accident. By 8:50 a.m., RGIS reported the incident to its Primary Insurer and Gallagher Bassett Services, Inc. ("Gallagher Bassett"), the third-party administrator for the Primary Insurer. RGIS notified Camrac of the accident later in the day on April 8, 2003. By April 15, 2003, RGIS, Camrac and Birardi were aware that Shore was in critical condition. Birardi received a letter of representation from Shore's counsel on or about April 21, 2003, concerning Shore's intent to pursue a claim, which Birardi facsimiled to RGIS on April 25, 2003. Elco Administrative services ("Elco"), Camrac's claims administrator, received a letter of representation from Shore's counsel on or about April 23, 2003. Elco's May 23, 2003 excess claim report states that Shore was paralyzed on one side, on life support and would have permanent physical deficits. RGIS received a brief overview of Shore's injuries on May 8, 2003.

The Primary Insurer retained Cella, Flanagan & Weber, P.C. ("Cella") to provide Defendants with an assessment of the potential value of Shore's claim and thereafter to defend Defendants in the Shore Action.

On May 11, 2003, a Middlebury, Connecticut Police Officer, Anthony Quicquaro, who witnessed the accident while he was on patrol, submitted an official Accident Report. His report stated that

> [i]n the course of the investigation, this officer interviewed ... snow plow operators [who] were acting in that capacity that morning. All 3 had seen Shore walking west ... in the hour preceding the accident.... According to the snow plow operators, he was seen, at times, walking in

'the middle of the road.' When he saw (or heard) a vehicle approaching, he would then step off to the side.

> As this officer [Officer Quicquaro] was traveling westbound he observed Shore walking. Shore was walking in the bare pavement (plowed) portion of the roadway....

> The snow had fallen throughout the previous evening. The middle of the roadway was scraped down to bare pavement approximately 1 plow blade wide (12 feet) on the eastbound side of the double yellow line. When this officer observed Shore, he was walking on the part of the pavement that had been scraped clean. When this officer and Sgt. Williams examined the scene, there were no footprints or any other impressions which would lead to the conclusion that Shore could have been walking elsewhere besides the paved portion....

> *Final Analysis: Primary responsibility rested on Shore* who should have been walking as far to the side of the roadway as possible. Because of the snow on the side of the roadway, the bare pavement section of the roadway was restricted to approximately 7–7.5 feet.... [T]here left very little room for safe passage. Shore chose to walk on the bare pavement. As a result, the minivan struck Shore while the van was still operating within all legal parameters. This officer personally witnessed the collision and saw that the minivan did not have enough reaction time to perform any type of evasive maneuver. In conclusion, Shore was in violation of [Connecticut General Statutes] 53–182, Reckless Use of the Highway by a Pedestrian.

*\*3* (Weber Aff. Ex. 1 (emphasis added).)

The complaint against Defendants in the Shore Action, filed February 10, 2005, alleged that Shore sustained grave injuries as a result of the accident, including severe and massive head trauma resulting in a comatose state and prolonged unconsciousness, intestinal injuries, pneumonia and infection, closed fracture of second and third cervical vertebra, missing and damaged teeth, compound fracture of left clavicle, neurological impairment and impairment and/or loss of comprehension and cognitive abilities. (Ritzert Aff. Ex. 1.)

On June 15, 2005, Cella and Gallagher Bassett received a copy of Shore's Life Care Plan, which estimated Shore's continued medical and future damages to be approximately $3.7 million, as of about June 15, 2005. A mediation conference took place on June 21, 2007, and Shore's counsel

Case 3:19-cv-01521-KAD    Document 32    Filed 11/21/19    Page 27 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

made two settlement demands: $9.5 million and $7 .5 million. Cella made two settlement offers: $50,000 and $100,000. The parties did not reach a settlement.

Defendants gave their first notice to Lumbermens of the occurrence, claim and suit on January 14, 2008, the day before jury selection began on January 15. The trial was bifurcated, and following the completion of the liability phase on January 30, 2008, the jury found that Birardi was 100% responsible for the accident. On February 13, 2008, following the conclusion of the damages phase of the trial, the jury returned its verdict totaling $11,131,539.85 ($6,850,000 for noneconomic damages and $4,281,539.85 for economic damages). On or about May 28, 2008, RGIS's post-trial motion to set aside the jury's verdict was denied by the trial court, and on February 8, 2008, Lumbermens commenced the instant declaratory judgment action against Defendants. The parties cross move for summary judgment.

## II. STANDARD OF REVIEW

A court will not grant a motion for summary judgment pursuant to Fed.R.Civ.P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam* ). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249.

## III. DISCUSSION

Lumbermens seeks a declaratory judgment to the effect that it has no obligation to cover any recovery in the Shore Action on the ground that Defendants' notice was untimely. An insured's failure to comply with the notice requirement vitiates coverage, and, consequently, the insurer is relieved of its coverage obligations. *See Argo Corp. v. Greater N.Y. Mut. Ins. Co.,* 4 N.Y.3d 332, 339, 794 N.Y.S.2d 704, 827 N.E.2d 762 (N.Y.2005).

### A. Choice of Law

*\*4 In the absence of a choice of law provision in the Excess Policy, Lumbermens urges this Court to apply New York law to the Excess Policy and its obligations thereunder, and Defendants argue that Michigan law should apply. Further, the accident took place in Connecticut and Birardi is a resident of Connecticut; thus, that state too plays a role in the choice of law solution.

"The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Allstate Ins. Co. v. Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (N.Y.1993); *Globalnet Financial.com, Inc. v. Frank Crystal & Co.,* 449 F.3d 377, 382 (2d Cir.2006). Here, there is an actual conflict between the laws of New York, Connecticut and Michigan concerning whether an insurer can disclaim insurance coverage based on late notice without demonstrating that it was actually prejudiced. *See Am. Home Assur. Co. v. Int'l Ins. Co.,* 90 N.Y.2d 433, 661 N.Y.S.2d 584, 684 N.E.2d 14 (N.Y.1997); *Aetna Cas. & Sur. Co. v. Murphy,* 206 Conn. 409, 538 A.2d 219, 223 (Conn.1988); *Wehner v. Foster,* 331 Mich. 113, 49 N.W.2d 87 (Mich.1951). Lumbermens would benefit from the application of New York law, which would not require it to show that it was prejudiced by any untimely notice.

In resolving a choice of law issue, New York courts follow a "center of gravity" or "grouping of contacts" rule, which requires the application of the law of the state with the "most significant relationship to the transaction and the parties." *See, e.g., Zurich Ins. Co. v. Shearson Lehman Hutton,* 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (N.Y.1994). This approach generally dictates that a contract of liability insurance is subject to the law of the "principal location of the insured risk." *Id.* However, where, as here, the insurance policy in question covers risks that are spread throughout multiple states, the court must consult broader choice-of-law principles. *Id.* at 318, 618 N.Y.S.2d 609, 642 N.E.2d 1065.

An intermediary state appellate court in New York has held that "[i]n the case of a corporate insured seeking coverage under a policy covering risks in multiple states," the court should apply the law of the insured's domicile. *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.,* 36 A.D.3d 17, 22–23, 822 N.Y.S.2d 30 (N.Y.App.Div.2006) (*"Foster Wheeler"* ). The court held that in such a case "the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." *Id* at 24, 822

Case 3:19-cv-01521-KAD  Document 32  Filed 11/21/19  Page 28 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

N.Y.S.2d 30. Noting that the "grouping of contacts" theory requires the court to apply the policy of the "jurisdiction most intimately concerned with the outcome of the particular litigation," *id.* at 22, 822 N.Y.S.2d 30 (quoting *Auten v. Auten,* 308 N.Y. 155, 161, 124 N.E.2d 99 (N.Y.1954)), the court considered the competing jurisdictions' "governmental interests" in

> (1) regulating conduct with respect to insured risks within the state's borders; (2) assuring that the state's domiciliaries are fairly treated by their insurers; (3) assuring that insurance is available to the state's domiciliaries from companies located both within and without the state; and (4) regulating the conduct of insurance companies doing business within the state's borders.

*5 *Id.* (citing *Fireman's Fund Ins. Co. v. Schuster Films, Inc.,* 811 F.Supp. 978, 984 (S.D.N.Y.1993)).

The court found that these interests, "in the aggregate, weigh in favor of applying the law of the insured's domicile, notwithstanding that certain other states (*e.g.,* the states of the insurer's domicile, and where negotiation and contacting occurred) may share, to a lesser extent, in the fourth interest enumerated above." *Id.* at 23, 822 N.Y.S.2d 30.

However, this Court is reluctant to interpret *Foster Wheeler* as imposing a bright-line rule. The case is distinguishable because it involved "a large number of excess liability insurance policies," even hundreds, and thousands of asbestos-related personal injury claims against the insured. *Id.* at 18–19, 822 N.Y.S.2d 30. Where, as here, only one policy and one cause of action is at issue, it is more feasible to assess the various states' contacts with the matter. Nevertheless, this Court affords the insured's domiciliary state substantial weight, in light of the "governmental interests" enumerated in *Foster Wheeler.*

Other courts applying New York law have examined the following factors, listed in the Restatement on Conflict of Laws § 193 in the context of an insurance policy with risks spread throughout multiple states: "the location of the insured risk; the insured's principal place of business; where the

policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business." *Schwartz v. Twin City Fire Ins. Co.,* 492 F.Supp.2d 308, 317 (S.D.N.Y.2007), *rev'd on other grounds, Schwartz v. Liberty Mutual Insurance Co.,* 539 F.3d 135 (2d Cir.2008); *Olin Corp. v. Ins. Co. of N. Am.,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991). *See also Steadfast Ins. Co. v. Sentinel Real Estate Corp.,* 283 A.D.2d 44, 50, 727 N.Y.S.2d 393 (N.Y.App.Div.2001) ("Given the nationwide scope of [the insured's] operations, the principal location of the insured risk should be deemed to be the state where [the insured] is incorporated and has its principal place of business, from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made.").

Thus, in *Schwartz,* the court applied California law to the insured's breach of contract claim against his insurers because (1) the policies listed the insured's address in California; (2) the only state-specific endorsements to the policies were California endorsements; (3) the insured had several hundred employees based in California and less than a dozen in New York.[2] 492 F.Supp.2d at 318. Similarly, in *Olin,* the court applied New York law because (1) the insured had been headquartered in New York prior to 1970; (2) the insured maintained offices in New York after 1970; (3) the insured's insurance broker was located in New York; and (4) the significant aspects of contract formation and performance occurred in New York. 743 F.Supp. at 1049.

*6 Here, the policyholder, RGIS, has its principal place of business in Auburn Hills, Michigan, and provides inventory services to corporate clients in all fifty states and internationally. It conducts its global operations, including its liability insurance program, out of its offices in Auburn Hills, Michigan. (Davidson Aff. ¶ 5.) Camrac and Birardi, are domiciled in Connecticut. Lumbermens has its principal place of business in Illinois. (Lumbermens' Mem. of L. 6.)

At the time the excess insurance policy at issue was placed, RGIS's insurance broker was Marsh USA ("Marsh"). RGIS's risk manager, Teri Davidson ("Davidson"), negotiated the Excess Policy from RGIS's office in Auburn Hills, Michigan, and communicated with Marsh's office in Detroit, Michigan. Marsh Detroit was responsible for the placement of RGIS's entire world-wide liability insurance program, including the Excess Policy. (*See* Davidson Aff. ¶ 15 .) In negotiating the Excess Policy with Lumbermens, RGIS

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 29 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

gave instructions to Marsh Detroit, which communicated with Marsh's office in New York ("Marsh New York"), which, in turn, communicated with Lumbermens' office in New York. (*See* Defs.' Counterstatement ¶ 24.) Marsh New York would then report back to Marsh Detroit. (*Id.* ¶ 25.) RGIS asserts that Marsh *Detroit* personnel had the exclusive authority to bind coverage. (*Id.*) Lumbermens claims that after Lumbermens' New York office completed its underwriting analysis, it delivered the Excess Policy to Marsh New York, but RGIS asserts that it received the policy in Michigan from Marsh Detroit. (*Id.* ¶ 26.) In any event, it is undisputed that the Excess Policy was delivered to RGIS, the policyholder, at its Auburn Hills, Michigan office. Further, RGIS paid premiums under the Excess Policy in Michigan, with funds drawn from a Michigan bank. (*See* Davidson Aff. ¶¶ 14–16, 18–27.)

Further, Lumbermen's Excess Policy contains several riders, or "endorsements," which modify the policy, including endorsements titled "Michigan Changes" and "Michigan Changes–Cancellation and Nonrenewal." (McGregor Aff. Ex. B.) There are no other state-specific endorsements. (*Id.*)

Therefore, while New York has some contacts with the Excess Policy, in light of the factors enumerated above and the weight given to the state of the insured's domicile, this Court will apply Michigan law.

**B. Timeliness of Notice**
This Court now turns to the question of whether Defendants' notice was timely under the Excess Policy. As described above, the Excess Policy required Defendants to notify Lumbermens of an accident, claim or suit when it "appear [ed] likely" that the accident, claim or suit would involve the policy, *i.e.*, when it appeared likely that the Primary Policy's $2 million limit would be exceeded.

The Michigan courts adhere to the principle that the language in an insurance policy is to be given its plain and ordinary meaning.[3] *See, e.g., Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 392 (6th Cir.2003) (applying Michigan law). The Oxford English Dictionary defines "likely" as "[h]aving an appearance of truth or fact; that looks as if it would happen, be realized, or prove to be what is alleged or suggested; *probable.*" Oxford English Dict. (2d ed.1989) (emphasis added). The Michigan Supreme Court, in a different context, has interpreted "likely" to mean "of such nature or so circumstantial as to make something probable and having better chance of existing or occurring

than not." *Moll v. Abbott Labs.,* 444 Mich. 1, 22, 506 N.W.2d 816 (Mich.1993) (quoting Black's Law Dictionary 6th ed.).[4] Therefore, Defendants were obligated to provide notice to Lumbermens once the accident, claim or suit appeared probable, or more likely than not, to exceed more than $2 million.[5]

*\*7 In Aetna Casualty & Surety Co. v. Dow Chemical Co.,* 10 F.Supp.2d 800 (E.D.Mich.1998), the court, applying Michigan law, observed that "rubbery language" in excess insurance policies, such as "appears likely" language in a notice provision, "is designed to give 'the insured some leeway or discretion in forming a judgment about when ... protection is implicated.'" *Id.* at 809 (quoting 684 N.E.2d at 606). The court held that the "appears likely" language in the excess policy's notice provision required the excess insurer "to show that the insured 'had information or had formed an opinion at a particular time that a claim would implicate' the policy and 'then failed to notify the insurer for an unreasonable period thereafter.'" *Id.* (quoting *Employers' Liability Assur. Corp., Ltd. v. Hoechst Celanese Corp.,* 43 Mass.App.Ct. 465, 684 N.E.2d 600, 606 (Mass.1997)). The excess insurer must bear its burden without the benefit of hindsight. *See id.* Because the excess insurers failed to establish, as a matter of law, the date on which the insured "knew" that the claim would exhaust its primary policies, the court denied summary judgment. The court found that questions of material fact existed regarding when the insured "should have *reasonably* concluded that its excess insurance policies were likely to be implicated." *Id.* at 829 (emphasis added).

Here, the third-party claims administrator, Gallagher Bassett, and Discovery Managers, Ltd., the claims managing agent for the Primary Insurer, investigated the incident, communicated with Shore's counsel and retained a law firm, Cella. (*See* Spray Aff. Exs. 3–8, ¶¶ 9–15; Weber Aff. ¶ 5; Davidson Aff. ¶¶ 31–33.) Every professional who investigated the accident on behalf of RGIS and Birardi found that any finding of liability against Defendants was unlikely, *i.e.,* less than 50%, and that the claim should be fully resolved well within the limits of the Primary Policy. Initially, the professionals thought the claim was so insubstantial as to have no settlement value at all, although the Primary Insurer eventually set a reserve of $25,000, which remained in place from April 2003 through July 2005. The indemnity reserves were increased to $500,000 only after the Shore Action was commenced, and to $1 million in April of 2007, in anticipation of the formal mediation of the claim. (*See* Spray Aff. Ex. 9; Davidson

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 30 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

Aff. ¶ 40, Exs. 12–14.) The Primary Insurer's reserves never exceeded $1 million, half the limit of the Primary Policy. (*See* Davidson Aff. ¶ ¶ 39–43.)

Reserves were set so low because Defendants believed that they would likely be held not liable, or, if they were *held liable,* that they would be liable for only a small amount of damages, due to Connecticut's comparative fault statute, which applied to Shore's claim. That statute provides that Shore would not be entitled to any damages if he were found to be more than 50% liable for the accident. In light of Officer Quicquaro's Accident Report, quoted above, in which an eyewitness found that Shore was primarily responsible for the accident, Defendants' belief was not unreasonable. The officer found that Shore was walking in the middle of the road and Birardi had no time to avoid a collision. Further, the facts that the minivan driven by Birardi struck Shore just after Birardi crested a hill, another vehicle was approaching toward Birardi with his lights on, and Shore, who was dressed in dark clothing, was not immediately visible to Birardi bolster the reasonableness of Defendants' belief that liability was at best a question mark. (*See* Weber Aff. Ex. 1.)

**\*8** On August 19, 2004, Cella completed a "Liability Damages Opinion Letter," with the purpose of determining, what, if any, damages *might* result from an action arising out of Shore's injuries, based on the information known at that time. (Ritzert Aff. Ex. 27.) Cella estimated the value of Shore's injuries, exclusive of future medical costs, to be between $1.25 million and $4 million. (*Id.*) However, the counsel reached such an estimate explicitly "without regard to comparative fault" and, indeed, opined that the likelihood of a verdict for *Defendants* on liability issues was 90%. (*Id.*)

Nearly three years later, Defendants' view had not changed, after commencement of the Shore Action and additional investigation. In a May 4, 2007 mediation report to Gallagher Bassett, Cella reiterated that "this case presents the rare situation where the chance of a defense verdict outweighs the chance of a plaintiff verdict." (Ritzert Aff. Ex. 37 at 20.) However, noting that there was a "slight" risk of a substantial damages award, Cella noted that "there is considerable value to settling this claim short of trial." (*Id.*) To that end, Cella estimated the damages in the unlikely event that a jury would return a plaintiff's verdict. Even then, Cella found that "the most likely scenario, should a jury return a plaintiff's verdict, presently consists of the 50% comparative fault threshold," which would permit Shore to recover 50% of the amount of damages, *i.e.,* under Cella's estimates, in the unlikely event of

a plaintiff's verdict, Shore could recover between $1.5 million and $3.5 million. (*Id.*) Although this range could implicate the Excess Policy, it does not suggest that it "appeared likely" to Defendants that the Excess Policy would be implicated. Indeed, the report is clear that Defendants continued to believe that Shore most likely would recover nothing. [6]

It is undisputed that settlement negotiations continued to the eve of trial. Once Defendants realized that they would not reach a settlement, they notified Lumbermens of the accident, claim and suit. Given the above and other evidence submitted by the parties, this Court is of the view that Defendants, as a matter of law, provided timely notice within the meaning of the Excess Policy.

**C. Actual and Material Prejudice**

Because I find Defendants' notice to have been timely, I need not reach the question of whether Lumbermens has demonstrated actual and material prejudice. "It is a well-established principle of Michigan law that *untimely* notice will not excuse an insurer's obligation to indemnify unless it can prove it was actually and materially prejudiced by the insured's delay." *Aetna,* 10 F.Supp.2d at 810 (emphasis).

This Court finds, nevertheless, that Lumbermens has failed to show actual and material prejudice. Under Michigan law, "[p]rejudice will be found where the delay 'materially impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party.'" *West Bay Exploration v. AIG Specialty Agencies,* 915 F.2d 1030, 1036–37 (6th Cir.1990). While the insurer does not need to prove that but for the delay it would have avoided liability altogether, *id.* at 1037, it may not establish actual prejudice by simply asserting that the delay in providing notice created lost opportunities, *Aetna,* 10 F.Supp.2d at 813. Rather, "the insurer must identify 'the precise manner in which its interests have suffered.'" *Id.* (quoting *Hoechst,* 684 N.E.2d at 608).

**\*9** Michigan courts consider "whether the delay has materially impaired the insured's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured." *Id.* Further, an insured's claims of prejudice "must be supported by more than the insured's bald assertion that the opportunity to [evaluate, negotiate, defend, or settle a claim or suit] has been lost." *Id.* at 814. The insurer must

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 31 of 37

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...

2009 WL 137055

present evidence that establishes that its position was actually prejudiced. *Id.*

Here, Lumbermens asserts that if it had received notice earlier, it could have participated in the mediation conference and settlement negotiations and ensured that Defendants' defense counsel retained the proper experts to refute Shore's theory of liability and damages in the underlying action. However, Lumbermens provides no evidence, beyond its own speculation, to show that it would have participated in the mediation, or procured experts, or that the mediation would have likely reached closure or generally that the Shore Action would have ended any differently. *See Sudul v. Coregis Insurance Co.,* No. 214715, 2001 WL 633698, at *4 (Mich.Ct.App.(2001) (holding that excess insurer had "not provided any support for its assertion of prejudice arising merely from its obligation to pay a portion of the jury verdict, a risk it had contractually assumed and for which it was compensated [in its insurance policy]").

Here, the Excess Policy explicitly stated that Primary Insurer would defend the insured and investigate claims. In *Coregis,* although the excess insurer did not receive notice of its potential liability until after the completion of the second trial, the court noted that "[a]s a true excess insurer, Coregis expected the primary insurer to conduct the investigation, negotiation, and defend the claims until the primary insurer's limits were exhausted." *Id.* at *3 (citing *Bosco v. Bauermeister,* 456 Mich. 279, 295, 571 N.W.2d 509 (Mich.1997). The excess insurer cannot simply second-guess the primary and complain that it would have handled the claim or defense differently, but bears a heavy burden of demonstrating that the claim was not handled and defended in a manner consistent with normal industry practices. *See id.* at *2, 571 N.W.2d 509. The *Coregis* court thus affirmed summary judgment in favor of insureds.

Finally, the fact that Lumbermens refused to participate in the defense once it did receive notice, (*see* Tr. of Oral Argument, Jan. 7, 2009, 20:20–25), militates against prejudice. Any prejudice "does not become material where the carrier, upon notice, does not act or properly act to protect its interest and/or that of its insured," because "[s]uch prejudice was not attributable, in its ultimate sense, to the insured's failure to

give notice of suit, but rather to the insurance carrier's failure to act upon receiving notice." *Burgess v. Am. Fidelity Fire Ins. Co.,* 107 Mich.App. 625, 310 N.W.2d 23, 25 (Mich.1981), *see also Aetna,* 10 F.Supp.2d at 813 (quoting *Upjohn Co. v. Aetna Cas. & Surety Co.,* 768 F.Supp. 1186, 1205 (W.D.Mich.1990)) ("Courts have also considered whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured.").

*10 Here, Lumbermens received notice on January 14, 2008, a day before jury selection. However, the jury did not return a verdict with respect to liability until more than two weeks later, on January 30, 2008, and the damages phase began sometime after this date. The jury did not return its verdict on damages until February 13, 2008, approximately one month after Lumbermens was notified. Further, as the damages phase of the trial began, a series of requests were made to Lumbermens to reconsider its position, but Lumbermens reiterated its denials of coverage, (*see* Davidson Aff. Ex. 15–18), and failed to participate in the trial.

Therefore, even if Defendants' notice were untimely, Lumbermens has not established material and actual prejudice as a matter of law .[7]

## IV. CONCLUSION

For the foregoing reasons, Lumbermens is not relieved of its coverage obligations under the Excess Policy because Defendants' notice was not untimely and, even if it were, Lumbermens has not shown actual and material prejudice. Lumbermens' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

The Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**

All Citations

Not Reported in F.Supp.2d, 2009 WL 137055

Footnotes

1    Unless otherwise indicated, the source of the facts in this background section is the "undisputed" portion of Defendants' Counter–Statement Pursuant to Rule 56. 1, dated Sept. 16, 2008.

Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC, Not Reported in...
2009 WL 137055

2    The court also noted that the application of California law was unopposed. 492 F.Supp.2d at 318.

3    Because this Court applies Michigan law, it is not bound by the case cited by Lumbermens, *Christiania General Insurance Corp. of New York v. Great American Ins. Co.,* 979 F.2d 268 (2d Cir.1992), which applied New York law. In *Christiania,* the Court interpreted the "appears likely" language in a notice provision to mean that the insured had a duty to provide notice when "a reasonable insured in [the insured's] position could have believed it 'appeared likely' the claims that it was being told about would involve [the] reinsurance." *Id.*

4    Interestingly, there is no entry for "likely" in the seventh edition of Black's Law Dictionary.

5    The cases cited by Lumbermens to support its proposition that notice was required within a reasonable period of time after the accident are inapplicable because the policies at issue in those cases expressly required notice within a "reasonable period of time," or "as soon as practicable," after an occurrence. Here, in contrast, Lumbermens and RGIS agreed to an "appears likely" standard. *See Brennan Bros. Co. v. Lumbermens Mut. Cas. Co.,* 14 A.D.3d 525, 789 N.Y.S.2d 428, 429 (N.Y.App.Div.2005); *St. James Mech., Inc. v. Royal & Sunalliance,* 44 A.D.3d 1030, 845 N.Y.S.2d 83, 84 (N.Y.App.Div.2007); *Great Canal Realty Corp. v. Seneca Ins. Co.,* 5 N.Y.3d 742, 743, 800 N.Y.S.2d 521, 833 N.E.2d 1196 (N.Y.2005); *White v. New York,* 81 N.Y.2d 955, 957, 598 N.Y.S.2d 759, 615 N.E.2d 216 (N.Y.1993).

6    Moreover, Defendants believed Shore's settlement demands of $9.5 million and $7.5 million were so unreasonably high that they countered with offers of $50,000 and $100,000. Had it appeared probable to Defendants that they would be liable for more than the $2 million Primary Policy limit, they likely would not have made such low offers.

7    Many of the cases cited by Lumbermens with respect to prejudice are not on point because they address the prejudice caused by late notice to a *primary* insurance carrier, which, due to its obligation to investigate and defend a claim, and to provide the first layer of coverage, stands in a much different position from an excess carrier. *See, e.g., Wehner v. Foster,* 331 Mich. 113, 49 N.W.2d 87 (Mich.1951); *Wood v. Duckworth,* 156 Mich.App. 160, 401 N.W.2d 258 (Mich.Ct.App.1986).

---

End of Document          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:19-cv-01521-KAD Document 32 Filed 11/21/19 Page 33 of 37

Darwin Select Insurance Company v. Middlesex Health..., Not Reported in A.3d...

2016 WL 7974294
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Hartford at Hartford.

Darwin Select Insurance Company

v.

Middlesex Health System, Inc.

HHDCV136046594S
|
December 16, 2016

Opinion

PECK, J.T.R.

**\*1** The plaintiff, Darwin Select Insurance Company (Darwin), has brought this declaratory judgment action to determine whether the defendant, Middlesex Health System, Inc. (MHS), is entitled to indemnification under its insurance policy with the plaintiff regarding the settlement of a claim related to the death of Samuel Alsback. The plaintiff, Darwin filed a third amended complaint on July 14, 2016, alleging the following. "Between October 1, 2009 and October 1, 2010, the [defendant's] insurance program included a $1,000,000 Self Insured Retention ... a $10,000,000 First Excess Layer issued by Lexington Insurance Company ... and a $20,000,000 Second Excess Layer issued by Darwin as Policy No. 0303–7037" (2009 policy) and that "[o]n October 1, 2010 Darwin replaced Lexington as the First Excess Layer, issuing an annual Health Care Organization Umbrella Liability Insurance Policy with a $10,000,000 Limit of Liability excess of a $1,000,000 SIR, also as Policy No. 0303–7037" (2010 policy). The 2009 policy had, as a condition precedent to coverage, the requirement that the insured provide the insurer "with prompt notice of any claim under any Underlying Insurance, *or any circumstance which could give rise to a claim under any Underlying Insurance,* involving any of the following ... *unexpected deaths ...*" (Emphasis original.) The 2010 policy had as a condition precedent to coverage, the requirement that the insured provide the insurer "with prompt notice of any Claim under any Underlying Insurance, *or circumstances that could give rise to a Claim* under any Underlying Insurance, involving any of the following: a. unexpected

deaths ..." (Emphasis original.) "Alsback, a 38–year-old male, presented to the Emergency Department at Shoreline Medical Center (Shoreline) a facility run by [the defendant]. Mr. Alsback was treated by Dr. David Courtney, an emergency medicine physician employed by [the defendant]." "After receiving intravenous fluids and undergoing a variety of tests, Mr. Alsback was discharged on the evening of June 21, 2010." "Mr. Alsback returned to Shoreline ... the following morning and was diagnosed with bacterial meningitis. He was treated by Dr. William Lynders, an emergency medicine physician employed by [the defendant]." "Mr. Alsback was transferred to Yale New Haven Hospital. During transfer, Mr. Alsback 'coded.' He did not fully recover. He passed away at 2:18 p.m. on June 23, 2010, less than 48 hours after initial presentment at Shoreline, ... the cause of death was pneumococcal meningitis." Because the defendant failed to give the plaintiff notice of Alsback's "unexpected death," which was a condition precedent to coverage under the policy, the defendant is not entitled to indemnification for the settlement it reached in the wrongful death suit brought by Melissa D. Symonds–Alsback, the decedent's widow and the administrator of his estate. The plaintiff was prejudiced by the failure to report Alsback's death because, "[h]ad [the defendant] given [the plaintiff] timely notice of the Alsback['s] [u]nexpected [d]eath, [the plaintiff] would have been able to make an informed decision about whether and under what terms to offer renewal coverage" and "because [the defendant] seeks to have [the plaintiff] pay Settlement costs in excess of $1,000,000 where it had previously been obligated to pay loss only in excess of $11,000,000."

**\*2** By way of counterclaim, the defendant alleges that pursuant to the 2010 policy, the plaintiff is responsible to pay up to $10 million, in excess of the defendant's $1 million self-insured retention, which the defendant becomes legally obligated to pay as a result of a claim made against it during the policy period, provided notice is given to the plaintiff in accordance with the policy's "reporting/notice provisions." The counterclaim further alleges that the term "claim" is defined in the policy "as a written demand seeking monetary damages." On August 24, 2011, the defendant received its first notice of the claim involving the death of Samuel Alsback. Shortly thereafter, the defendant reported the claim to the plaintiff. Notwithstanding the defendant's notice to the plaintiff in accordance with the provisions of the policy, the plaintiff wrongfully advised the defendant, on September 16, 2013, that it was denying coverage due to the defendant's failure to satisfy the notice provision contained in the policy. Finally, the defendant alleges that despite

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 34 of 37

Darwin Select Insurance Company v. Middlesex Health..., Not Reported in A.3d...

the plaintiff's wrongful denial of coverage, the plaintiff has refused to rescind its denial and has acted in bad faith.

The parties have filed cross motions for summary judgment on the issue of whether the plaintiff must indemnify the defendant for the payment in excess of $1,000,000 paid in settlement of the claim made on behalf of Alsback's estate. Both parties have objected to the other's motion. The issues have been fully briefed. The court heard oral argument on the motions on August 22, 2016.

I

## SUMMARY JUDGMENT STANDARD

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard." (Internal quotation marks omitted.) *Romprey v. Safeco Ins. Co. of America*, 310 Conn. 304, 319–20, 77 A.3d 726 (2013). "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent ... When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue ... Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue ... It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17–45]." *Ferri v. Powell–Ferri*, 317 Conn. 223, 228, 116 A.3d 297 (2015).

II

## CLAIMS OF PARTIES

Both sides argue that they are entitled to judgment as a matter of law as to whether the plaintiff is required to indemnify the defendant for its settlement of the Alsback wrongful death lawsuit for the amount in excess of $1 million. The plaintiff contends that there is no genuine issue of material fact that Alsback's death was an "unexpected death" under the policy; the defendant's prompt reporting of that death was a condition precedent to coverage for actions related to it under the policy; the defendant did not promptly report Alsback's death to the plaintiff; and, the plaintiff was prejudiced by the defendant's failure to report Alsback's death because not having that information affected its ability to make an informed decision regarding extending coverage to claims exceeding $1 million under the 2010 policy, when it had previously only covered claims exceeding $11 million.

In opposition, and in support of its motion for summary judgment, the defendant argues that "there is no question but that prompt notice of t[he Alsback action], or Claim, was provided to [the plaintiff] in accordance with the Policy's 'Reporting/Notice' provision which states that '[the defendant] must provide [the plaintiff] with prompt notice of any Claim under any Underlying Insurance ...' " and, because the claim was made during the policy term, "the Insuring agreement is triggered by its express terms and [the plaintiff's] purported disclaimer is invalid." According to the defendant, the plaintiff reads into the 2010 policy a notice requirement that is not there, namely "the reporting of 'circumstances that could give rise to a claim.' " The defendant contends that the plaintiff's "position that the policy obligated [the defendant] to provide notice of the circumstances involving Mr. Alsback's death because that death was an unexpected death" is "untenable and ignores that part of Section IV.D.1 [of the 2010 policy] that prescribes the information that must be included in the notice to [the plaintiff]." [1]

**\*3** The defendant further asserts that there is no genuine issue of material fact that the plaintiff "was not prejudiced by what it purportedly—and belatedly—claims is late notice and in fact, [the plaintiff] has waived the right to make any such claim." In particular, the defendant argues that the plaintiff "does not claim that it was prejudiced in its ability to evaluate the Alsback Claim" and "failed to open a file or respond to [the defendant's notice] for nearly two years," "took no efforts to expressly reserve its rights as to [the] purported late notice," and "has not sought to rescind or reform the 2010 policy

**Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 35 of 37**

Darwin Select Insurance Company v. Middlesex Health..., Not Reported in A.3d...

despite its claim that it somehow was prejudiced at the time of the policy's issuance." Instead, "after being put on notice of the Alsback lawsuit, continued to renew the 2010 policy under substantially similar terms and at a lesser premium."[2] Finally, the defendant argues that to the extent that the policy is subject to more than one interpretation, it is ambiguous and the ambiguity should be resolved in its favor.

Regarding the interpretation of an insurance policy, our Supreme Court has stated: "[C]onstruction of a contract of insurance presents a question of law for the court ... An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract ... In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the ... [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy ... If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning ... Under those circumstances, the policy is to be given effect according to its terms ... When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result ...

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity ... Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms ... As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading ... Under those circumstances, "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy ... This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous." (Citations omitted; internal quotation marks omitted.) *Connecticut Medical Ins. Co. v. Kulikowski,* 286 Conn. 1, 5–6, 942 A.2d 334 (2008).[3]

III

## THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The plaintiff first argues that Alsback's death was an "unexpected death" that the defendant failed to report promptly as required by the terms of the policy. As previously stated, the applicable notice provision in endorsement number three to the 2009 policy reads as follows: "As a condition precedent to the Insurer's obligation under this Policy, the Insured will provide the Insurer with prompt notice of any claim under any Underlying Insurance, *or any circumstances that could give rise to a claim under any Underlying Insurance, involving any of the following: ... unexpected deaths* ..." The 2010 policy, in section IV.D.1a, with a slight variation, similarly provides: "The Insured must, as a condition precedent to any right to coverage under this Policy, comply with the notice and reporting provisions set forth below ... The Insured must provide the Insurer with prompt notice of any claim under any Underlying Insurance, *or circumstances that could give rise to a claim under any Underlying Insurance, involving any of the following: ... unexpected deaths* ..."[4] (Emphasis added.)

**[4]** Even assuming Alsback's death was unexpected, based on the evidence presented, there is a genuine issue of material fact that the death occurred under a circumstance "that could give rise to a claim under any underlying insurance." In particular, the "Peer Review" submitted into evidence concludes that "[t]he care was appropriate on the first visit. The WBC and bandemia were very impressive, but the patient looked fine. Leukocytosis is, unfortunately, neither sensitive nor specific for identification of this very rare patient who will progress to pneumococcal meningitis. The care was excellent on the second visit. The meningitis was quickly recognized and aggressively treated, the respiratory decompensation was rapidly addressed, and the brain edema was appropriately and quickly treated." Only one area of interventional improvements was mentioned with a notation that "[t]he magnitude of the benefit of these interventions is uncertain, but they are recommended in the setting of a high-stakes case such as this one." (Emphasis added.) The peer review report is dated August 3, 2010. It is the only evidence of what the defendant knew until August 24, 2011, when the defendant's director of risk management was advised by the attorney for Alsback's estate that a lawsuit would be brought against the defendant. Therefore, the plaintiff has failed to demonstrate that there is no genuine issue of material fact as to whether Alsback's death, whether or not unexpected,

Case 3:19-cv-01521-KAD   Document 32   Filed 11/21/19   Page 36 of 37

Darwin Select Insurance Company v. Middlesex Health..., Not Reported in A.3d...

was a circumstance "that could give rise to a claim under any Underlying Insurance."

Beyond the foregoing unresolved issue of fact, the plaintiff's motion is deficient for a number of other reasons. The plaintiff fails to address the question raised by the defendant on concerning whether Alsback's death was "unexpected" within the meaning of the 2009 policy, as there is no definition contained in that policy. As pointed out by the defendant, however, there is a definition in the underlying Lexington policy, which rules out Alsback's death as "unexpected." The Lexington policy provides as follows:

> 4. You must give us written notice of any injury of the following types:
>
> a. unexpected death—suicides, sudden cardiopulmonary arrest (with or without successful CPR) ... [5]

The plaintiff also fails to address whether the slight variation in the quoted language of the 2009 and 2010 policies is of any significance. Nor does the plaintiff adequately address the defendant's assertion that the plaintiff's reading of the policy is inconsistent with other policy provisions concerning the necessary content of a notice of claim. The plaintiff also incorrectly assumes that it is the defendant's burden to refute the plaintiff's claim of prejudice when, under Connecticut law, "it is the insurer who bears the burden of proving, by a preponderance of the evidence, that it has been prejudiced by the insured's failure to comply with a notice provision." *Arrowood Indemnity Co. v. King,* 304 Conn. 179, 201, 39 A.3d 712 (2012). Further, contrary to the plaintiff's argument that it was prejudiced in not being able to make a properly informed decision regarding extending excess coverage to the plaintiff above $1 million in the 2010 policy year,[6] the evidence suggests that the plaintiff bungled the handling of the notice of claim first communicated to it by the defendant on August 26, 2011, and failed to inform its underwriter assigned to the defendant's policies of the pendency of the Alsback lawsuit and continued to renew the policy with the defendant on the same terms and at a lower premium for the 2011 and 2012 policy years.[7]

*5 Therefore, based on all the evidence presented, the plaintiff has failed to demonstrate that there is no genuine issue of material fact as to whether Alsback's death was unexpected or occurred in a circumstance "that could give rise to a claim under any Underlying Insurance." The plaintiff has also failed to meet its burden of demonstrating that there is

no issue of material fact concerning the issues of notice and its claim of prejudice, and that it is entitled to judgment as a matter of law. Accordingly, the plaintiff's motion for summary judgment must be denied.

IV

THE DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

In support of its motion for summary judgment the defendant claims that there is no issue of material fact that it is entitled to recover settlement costs arising out of the Alsback lawsuit incurred in excess of $1 million. In support of its motion, the defendant has submitted the affidavits both of Jeffrey Lemkin, its risk manager, and Gary J. Leonard, the Vice President for Western Litigation, Inc., a professional liability claims and risk management company that assisted the defendant with the administration of the Alsback claim. Although the Lemkin affidavit states that in order to effect a settlement of the Alsback lawsuit, given the plaintiff's coverage position, it "was forced to pay amounts over and above its self-insured retention," there are no other details of the settlement submitted as evidence.

For the reasons detailed in the discussion of the plaintiff's motion for summary judgment, the defendant has also failed to meet its burden "of showing the absence of any genuine issue as to all material facts." *Romprey v. Safeco Ins. Co. of America, supra,* 310 Conn. 319–20. "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact ... As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent ..." *Ferri v. Powell–Ferri, supra,* 317 Conn. 228. Rather than presenting evidence that demonstrates no genuine issue of material fact relating to their respective motions for summary judgment, both parties have presented evidence that demonstrates there are substantial issues of material fact in dispute particularly concerning when notice to the plaintiff was required under the policy. Simply stated, there are gaps and conflicts in the evidence offered by the parties, as persuasively argued by the defendant in opposition to the plaintiff's motion and in support of its own motion, that preclude the granting of summary judgment in this case.

Case 3:19-cv-01521-KAD  Document 32  Filed 11/21/19  Page 37 of 37

Darwin Select Insurance Company v. Middlesex Health..., Not Reported in A.3d...

## CONCLUSION

Accordingly, for all the foregoing reasons, both motions for summary judgment are hereby denied.

**All Citations**

Not Reported in A.3d, 2016 WL 7974294

## Footnotes

1   Specifically, the defendant argues that Section IV.D.1 of the policy also prescribes the information that must be included in the notice to Darwin, the specifics of which were not fully available to the defendant at the time of Alsback's death, including errors or omissions in his care or in the medical services provided to him.

2   In fact, the evidence submitted by the parties reflects that although Darwin was made aware of the Alsback lawsuit in late August 2011 and early September 2011, Darwin renewed the policy at the same level of excess coverage for both the 2011 and 2012 policy years at a lesser premium.

3   In addition, our Supreme Court has held that principle of statutory construction, the rule of contra proferentum, may only be invoked as a last resort if the court cannot otherwise resolve the ambiguity. See, *Cruz v. Visual Perceptions, LLC,* 311 Conn. 93, 107–08, 84 A.3d 828 (2014).

4   The 2010 policy deletes the word "any" before "circumstances that could give rise to a claim under any Underlying Insurance, involving any of the following: ... unexpected deaths ..."

5   Lexington was the first level excess carrier in 2009. This policy language is included in the evidence submitted by the plaintiff, appended to the affidavit of Nanci Bernstein, dated June 3, 2016.

6   The court notes that the plaintiff did not assert that it was prejudiced by the failure of the defendant to give it notice of Alsback's death before it issued the 2010 policy until it filed an amended complaint on April 2, 2015.

7   The plaintiff has put forward some evidence by way of affidavits, to show that the unexpected death notice provision is intended to aid its underwriting decision and that it did not have that information when extending additional coverage to the defendant under the 2010 policy. This is the prejudice alleged by the plaintiff in its amended complaints. The plaintiff, however, has not presented evidence that adequately addresses why it did not inform the defendant of its reservation of rights for more than two years or to explain why after having received notice of the Alsback lawsuit, it continued to issue the same excess policy to the defendant with a lower premium. Indeed, there is a lack of evidence presented as to what, if anything, transpired between the notice to the plaintiff of the Alsback lawsuit and the plaintiff's reservation of rights letter. This lack of information further undermines the plaintiff's claim of prejudice.

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.